**STATE of Maine**

v.

**Dale PRESTON and Wallace Preston.**

Supreme Judicial Court of Maine.

Feb. 21, 1980.

---

Michael Povich, Dist. Atty., Sandra Hylander Collier (orally), Asst. Dist. Atty., Michael D. Seitzinger, Asst. Atty. Gen.; Augusta, for plaintiff.

Francis J..Hallissey, Machias (orally), for Dale A.

John A. Mitchell, Calais (orally), for Wallace J.

Before McKUSICK, C. J., POMEROY, WERNICK, GODFREY, NICHOLS and GLASSMAN, JJ.

GODFREY, Justice.

The defendants, Dale and Wallace Preston, were jointly indicted for burglary, 17–A M.R.S.A. § 401 (Supp.1979) and theft, 17–A M.R.S.A. § 353 (Supp.1979). The Superior Court, Washington County, granted in part their pretrial motion to suppress certain evidence. The State appeals pursuant to 15 M.R.S.A. § 2115–A (Supp.1965–78) and Rule 37A(d), M.R.Crim.P., contending that certain admissions to the police made by the defendants are not excludable despite the fact that the police did not give *Miranda* warnings. Even if *Miranda* warn-

ings were required, the State urges that certain real evidence is still admissible. We deny the State's appeal.

Mr. and Mrs. Robert Kilton were caretakers for property owned by Charles Martin, located in Roque Bluffs. On the morning of September 10, 1978, Mr. Kilton discovered that the garage had been broken into during the night and that a Franklin-type stove and two army-surplus khaki mattresses were missing. Mrs. Kilton notified the police. Suspecting that defendant Dale Preston had committed the crime, she decided to do her own investigation. She went to Dale's trailer, found no one at home, and proceeded to search the premises. In a rear room she found a Franklin stove which looked like the one belonging to Martin. She reported her findings to Corporal David Burns of the state police, who incorporated them in an affidavit and request for a search warrant.

A warrant was issued on September 13, 1978. At 6:00 p. m. on that day, Corporal Burns, Game Warden Robert Carter, and two other law enforcement officers went to Dale Preston's trailer to execute the search warrant. On arrival, they found no one at home. Corporal Burns knew that Wallace Preston lived in a cabin about a hundred yards away from Dale's trailer; so, according to Burns, he and Warden Carter went to Wallace's cabin to find someone who could let them into the trailer. While he was waiting at the door, Burns said, he saw inside through some window "either in the door or right there beside the door" one khaki-colored mattress in a rear room. Burns testified that when he saw the mattress, he thought it was probably one of the two the police were looking for. Since no one answered at the cabin, Burns and the other officers returned to Dale's trailer.

A damaged lock made it easy to open the trailer door. The officers entered the trailer, where Burns found the stove in a back room. Warden Carter, having noticed what he thought was a deer roast on the table, looked in the refrigerator and discovered what he thought was deer meat. The officers seized the stove and took it to the county jail.

About an hour later, Corporal Burns and Warden Carter returned to the Preston trailer. On their arrival, Dale ran from the trailer into some nearby woods. The officers met three persons, including Wallace, outside the door of the trailer. Burns identified himself to Wallace as a police officer, told him about the seizure of the stove earlier, and informed him about seeing the mattress in his house.

Burns invited Wallace into his police cruiser, which was unmarked but "distinguishable as a police car". The two sat in the front seat. Warden Carter was in the rear seat. At no time during the conversation were *Miranda* warnings given. Burns testified he told Wallace that "he was talking to me of his own volition, that he could leave any time he wanted to. I didn't have any plans of making any arrest." According to Burns's testimony, Wallace admitted in the police car that he and Dale had stolen the stove and mattresses from the Martin garage, and that they had taken the mattresses to Wallace's cabin and the stove to Dale's trailer. Wallace then went over to his cabin and brought the mattresses to Corporal Burns, who put them in the police car and took them to the county jail.

About the time the conversation with Wallace ended, Dale returned from the woods. Burns told Dale he would like to talk to him a few minutes, that he had no intention of arresting him at that time, and that if he chose not to talk, he did not have to. Burns, Carter, and Dale got into the cruiser, where Burns told Dale about finding the stove and the mattresses. Dale then admitted the crime. Again no *Miranda* warning was given.

After the defendants were later arrested and indicted, they moved to suppress all the evidence seized on September 13 from their premises and any admissions made by the defendants. The court responded to the State's motion for specific rulings of law by stating that a warrant to search for a stove did not permit a search of the refrigerator, with the result that the deer meat had been

illegally seized.[1] The court held also that Burns' interrogation of each defendant had been custodial. Therefore, because of the lack of *Miranda* warnings, "the subsequent admissions and delivery of the mattresses were the product of improper interrogation." The stove had been seized pursuant to the warrant and was therefore held admissible.

After obtaining the requisite approval of the Attorney General, the State appealed. The defendants have not cross-appealed.

### I.

■ The State challenges the exclusion of the admissions made by the defendants to the police. *Miranda* warnings were not given to either defendant before the admissions were elicited. Those warnings must be given to a defendant whenever he is subjected to custodial interrogation. In the absence of such warnings, any statement made by the defendant during custodial interrogation is inadmissible against him. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ The presiding justice found, contrary to the State's contention, that the conduct of the police officers amounted to custodial interrogation. In reviewing the presiding justice's finding that *Miranda* warnings were required, the Law Court must examine the evidence with due regard for his opportunity to appraise the credibility of the testimony. *State v. Craney*, Me., 381 A.2d 630, 631 (1978).

■ Custodial interrogation occurs whenever a person is questioned by law enforcement officials while he is in custody or otherwise deprived of his freedom in any significant way. The State does not contend that interrogation did not take place. The only issue is whether defendants were in custody within the meaning of *Miranda*. The facts and circumstances of each case must be analyzed to determine if police conduct amounts to a significant deprivation of freedom. *State v. Inman*, Me., 350 A.2d 582, 597–98 (1976). *Compare Oregon*

*v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) *with Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). See generally, J. Smith, *The Threshold Question in Applying Miranda: What Constitutes Custodial Interrogation?* 25 S.Car.L.Rev. 699 (1974).

■ It is clear that by the time the police interrogated the defendants, the attention of the police had focused on both of them as suspects. That questioning has begun to focus on the interrogated person as a suspect is one circumstance to be weighed in determining whether an interrogation is custodial. *Miranda v. Arizona, supra* 384 U.S. at 490, 86 S.Ct. at 1636; *United States v. Hall*, 421 F.2d 540, 543 (2d Cir. 1969). "The more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers *Miranda* . . . ." *United States v. Hall, supra* at 545 (2d Cir. 1969). *See* Y. Kamisar, *"Custodial Interrogation" Within the Meaning of Miranda*, in *Institute for Continuing Legal Education, Criminal Law and the Constitution* 335 (1968).

The State argues that the fact that investigation had focused on the defendants was outweighed by the fact that the questioning took place in familiar surroundings, in the presence of a relative, and at a reasonable hour. However, the police diminished the possible effect of those factors by conducting the questioning of each defendant alone in an official police car. Certainly they increased the coercive nature of the interrogation by conducting it in the police car instead of inside the trailer or outdoors where they initially encountered the defendants.

Also significant, according to the State, is the fact that no arrest was made or any physical restraint imposed. In addition, Officer Burns informed each defendant that he was free to leave and did not have to talk. However, immediately after saying so, Burns also informed each defendant that the police knew the defendants were in

---

1. The State does not contest this ruling.

possession of stolen goods. By suggesting to defendants that the police had cause to arrest them even though they were not going to do so at that time, Burns increased the potential for creating the coercive atmosphere which triggers the requirement of the *Miranda* warnings. In view of all the circumstances, the presiding justice could have concluded reasonably that Burns's statement to each defendant that he was free to go presented an unrealistic alternative. Moreover, the justice was in a position from hearing the testimony of Burns and Carter to ascertain the tone and technique employed in the questioning of defendants.

 In all the circumstances, there was sufficient support for the presiding justice's finding that the line between general investigatory questioning and custodial interrogation was crossed in this case and that *Miranda* warnings were therefore required. He did not abuse his discretion in ordering suppression of the statements that defendants gave Corporal Burns on September 13, 1978.

## II.

The presiding justice ruled that the Franklin-type stove, having been lawfully seized under the search warrant, is not excludable from evidence on constitutional grounds. No controversy over that ruling arises on this appeal.

The suppression order from which the State has appealed provides that evidence is to be suppressed "as to deer meat, mattress and statements of each defendants."[2] In his response to the State's motion for specific rulings of law, the trial justice stated, among other things: "The defendants were interrogated without prior *Miranda* warnings under circumstances which constituted custodial interrogation. Therefore, the subsequent admissions and delivery of the mat-

tress were the product of improper investigation." Although the suppression order thus appears to refer to only one mattress, since the recorded testimony of Corporal Burns was clearly to the effect that Wallace Preston took both mattresses out of his cabin and brought them to Burns, the order must be construed as relating to both mattresses.

The question on appeal is whether it was an abuse of discretion for the trial justice to order the exclusion from evidence of the mattresses themselves, as the product of an unwarned custodial interrogation. The State argues on appeal that the "fruit-of-the-poisonous-tree" doctrine, applicable to fourth amendment violations under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), does not apply to evidence obtained as a result of a *Miranda* violation.[3] Second, the State contends that even if the fruit-of-the-poisonous-tree doctrine is applicable to the mattresses, they should not be excluded from evidence because the police knew from an independent source, *i. e.*, from Burns's direct observation, that they were in Wallace's cabin, and would have inevitably obtained possession of them.

Although it has had several opportunities to do so, the Supreme Court has never ruled that real evidence the police acquire as a consequence of statements they obtain from a defendant in violation of his rights under *Miranda* is subject to the same exclusionary rules as evidence derived from a fourth amendment violation. *See Massachusetts v. White*, 439 U.S. 280, 99 S.Ct. 712, 58 L.Ed.2d 519 (1978), *affirming without opinion by an evenly divided Court, Commonwealth v. White*, —— Mass. ——, 371 N.E.2d 777 (1977); *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

---

**2.** Neither in Superior Court nor in its brief on appeal has the State questioned the standing of either defendant to invoke the exclusionary rule with respect to any of the evidence. We have therefore not addressed possible issues of standing.

**3.** We referred to the question but did not decide it in *State v. Craney*, Me., 381 A.2d 630 (1978).

In *Orozco*, defendant was questioned by the police in his boarding house bedroom at four o'clock in the morning. The issues before the Supreme Court were whether Orozco's statements had been obtained as the result of "custodial interrogation" and whether a gun found by the police as a result of statements obtained from defendant without *Miranda* warnings was subject to exclusion from evidence as "fruit of the poisonous tree". The Texas courts had ruled admissible both the statements and the gun, and Orozco had been convicted. Reversing on the ground that the statements had been obtained in violation of *Miranda* rules, the Supreme Court simply ignored any question of exclusion of the gun.

In *Michigan v. Tucker*, the police interrogation had taken place before the *Miranda* decision came down. The police had acted in good faith, observing the rules laid down in *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but not advising the indigent accused of his right to have counsel appointed as *Miranda* requires. The Court in *Tucker* found it unnecessary to decide "the broad question of whether evidence derived from statements taken in violation of the *Miranda* rules must be excluded regardless of when the interrogation took place" *Michigan v. Tucker, supra,* 417 U.S. at 447, 94 S.Ct. at 2365. The Court held that testimony of a prosecution witness discovered by the police as a result of the pre-*Miranda* interrogation was admissible in the post-*Miranda* trial. The majority opinion in *Tucker* intimates that, at least where the police act in "complete good faith" and where the accused makes a "voluntary" statement, the Court will not necessarily apply the fruit-of-the-poisonous-tree doctrine to exclude witnesses located as a result of police interrogation that does not comply with *Miranda*.

The most recent decision of the Supreme Court on the point is its affirmance, in *Massachusetts v. White, supra,* by a vote of four to four, of a decision by the Supreme Judicial Court of Massachusetts. That court had set aside a conviction because of the admission in evidence of illegal drugs seized under a search warrant supported by a police affidavit based on statements made by the accused. Although the police had informed the accused of all his *Miranda* rights, the trial judge ruled that the accused had been so obviously intoxicated or drugged that he could not knowingly or intelligently, and hence effectively, waive his constitutional rights. The trial judge had accordingly suppressed defendant's statements. However, he had declined to order suppression of the illegal drugs themselves, ruling that the defendant's statements could be properly used in support of the application for the search warrant. In a unanimous decision, the Massachusetts Supreme Judicial Court reversed, relying on its earlier decision in *Commonwealth v. Haas,* 373 Mass. 545, 369 N.E.2d 692 (1977), holding that evidence obtained in violation of *Miranda* principles may not be considered in determining probable cause to make an arrest so as to validate an otherwise invalid search made incident to the arrest.

The Massachusetts court stated the rationale for its decision in *White* as follows:

> To hold otherwise would, in effect, sanction the initial violations of constitutional guaranties which the judge found took place in the police barracks. The need to prevent such violations from escaping review underlies the so-called "fruit of the poisonous tree" doctrine set forth in *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

*Commonwealth v. White, supra,* —— Mass. at ——, 371 N.E.2d at 781. On review by certiorari, the Supreme Court affirmed without opinion by an evenly divided court.

Considering *Michigan v. Tucker* and *Massachusetts v. White* together, we conclude that the Supreme Court will not require sweeping application of the fruit-of-the-poisonous-tree doctrine to all consequences of all violations of *Miranda* requirements. Nevertheless, if the rationale of the majority in *Tucker* is followed, it becomes important to determine in each such case of de-

rivative evidence whether, in the circumstances, enforcement of the exclusionary rule has some tendency to deter the police from engaging in conduct violating the fifth and sixth amendment rights of the accused. Thus, the prophylactic effect of exclusion on police practice seems to be critical in deciding how far to apply the exclusionary rule to evidence obtained as a result of *Miranda* violations.[4]

In the case before us, the mattresses represent the immediate product of the police officer's unwarned custodial interrogation; in fact, Wallace's delivery of them to Burns was part of his self-inculpatory response to Burns's interrogation. The connection between obtaining Wallace's admissions by custodial interrogation and obtaining the mattresses as evidence was not in the least remote or attenuated.[5] The deterrent effect on police misconduct of excluding admissions obtained as Wallace Preston's were, would be substantially reduced if real evidence delivered to the police as part of the suspect's direct response to the unwarned custodial interrogation were permitted in evidence. Nothing in the language of the majority opinion in *Tucker* requires such a result; on the contrary, application of the police-deterrence rationale must result in exclusion of the mattress-

es unless they fall within some exception to the exclusionary rule.

The State contends that Corporal Burns's observation of the mattresses through some window in Wallace's cabin provided an independent source of his knowledge that the mattresses were in Wallace's possession, with the result that the police would have inevitably obtained possession of them by getting a search warrant adequately based on probable cause. The State's argument is that the *Miranda* violation was not a *sine qua non* of the prosecution's obtaining possession of the mattresses. The trial court made no findings that would bear on the legality of Burns's presence on Wallace's premises or on the legality of the search that occurred when he looked into the cabin through some window, and it cannot be determined from the testimony in the record whether Burns's discovery of the mattresses was lawful or not. Also, we have no findings relevant to the question whether, in fact, seizure of the mattresses would have been inevitable. Nothing in the record establishes any factual basis for application of an inevitable-discovery exception to the exclusionary rule even if we were to decide that such an exception exists.

It is unnecessary, therefore, for us to decide in this case whether the inevitable-

---

**4.** It is a matter of controversy whether *Michigan v. Tucker* is correct in thus treating deterrence of police misconduct as an important criterion for determining the scope of the exclusionary rule where there has been a violation of the fifth amendment or rules implementing it. *See The Supreme Court, 1967 Term*, 82 Harv.L. Rev. 63, 222 (1968):

Under the fourth amendment, the essence of the constitutional wrong lies in the initial invasion of person or property; the exclusionary rule, as originally conceived, was a means of deterring this invasion. It is for this reason that the attenuation limitation arose in the fourth amendment context. As the causal chain between a wrongful act by the police and subsequent evidence becomes more attenuated, it becomes less likely that an intent to secure the evidence motivated the police action or that its exclusion would deter similar action in the future.

On the other hand, the gravamen of a constitutional wrong under the fifth amendment is the use of a defendant's coerced testimony against him in a criminal proceeding, not the mere act of compelling him to speak; the

fifth amendment exclusionary rule is an essential element of the constitutional right, not just a means of enforcing the right. (Footnotes omitted.)

*See also*, Douglas, J., dissenting in *Michigan v. Tucker*, 417 U.S. 433, 465, 94 S.Ct. 2357, 2374–2375, 41 L.Ed.2d 182; H. Shapiro, *Miranda Without Warning: Derivative Evidence as Forbidden Fruit*, 41 Brooklyn L.Rev. 325, 337–44 (1974).

**5.** *Cf. Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) (fourth amendment violation; attenuation doctrine recognized). *See also*, concurring opinion of White, J., and opinion of Powell, J., concurring in part and dissenting in part, in *Brown v. Illinois*, 422 U.S. 590, 606, 95 S.Ct. 2254, 2263, 45 L.Ed.2d 416 (1975) (illegal arrest followed by full *Miranda* warnings and then by confession; *held*, confession must be excluded under *Wong Sun* absent a showing by the government that it was "sufficiently an act of free will to purge the primary taint").

discovery exception may be properly engrafted on the exclusionary rule. The Supreme Court has not yet spoken on this controversial issue. *Compare People v. Fitzpatrick*, 32 N.Y.2d 499, 346 N.Y.S.2d 793, 300 N.E.2d 139 (1973) (applying an inevitable-discovery exception), *cert. denied* (White, J., joined by Douglas, J., dissenting), 414 U.S. 1050, 94 S.Ct. 554, 38 L.Ed.2d 338 (1973), *with United States v. Paroutian*, 299 F.2d 486 (2d Cir. 1962) (rejecting the exception) [6] *and United States v. Castellana*, 488 F.2d 65 (5th Cir. 1974) (rejecting the exception) ("to admit unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway would be to cripple the exclusionary rule as a deterrent to improper police conduct"), *rev'd on other grounds on rehearing en banc*, 500 F.2d 325 (5th Cir. 1974). *Compare* R. Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized*, 56 Calif.L.Rev. 579, 630 (1968), *and* Comment, *Scope of Taint Under the Exclusionary Rule of the Fifth Amendment Privilege Against Self-incrimination*, 114 U.Pa.L.Rev. 570 (1966), *with* R. Maguire, *How to Unpoison the Fruit*, 55 J.Crim.L.C. & P.S. 307, 317 (1964), *and* with S. LaCount & A. Girese, *"The Inevitable Discovery" Rule: An Evolving Exception to the Constitutional Exclusionary Rule*, 40 Albany L.Rev. 483 (1976). *See generally* Annot., 43 A.L.R.3d 385 (1972) (relating to consequences of fourth amendment violations).·

In the case of fourth amendment violations, once the initial police illegality has been shown with some evidence of its causal connection to the alleged product, the burden of persuasion is on the prosecution to show that its proof has an independent origin. *Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 165 (1969), *citing Nardone v. United States*, 308 U.S. 338, 334, 60 S.Ct. 266, 267–268, 84 L.Ed. 307 (1939) (independent-source exception). In applying its inevitable-discovery exception to the exclusionary rule for *Miranda* violations, the New York Court of Appeals in *People v. Fitzpatrick, supra*, imported a requirement similar to that of *Nardone*, that the prosecution has the burden of persuasion that the exception should be applied in the circumstances of the particular case. *People v. Fitzpatrick, supra*, 32 N.Y.2d at 507, 346 N.Y.S.2d at 798, 300 N.E.2d at 142.[7] Even if we were to declare that the inevitable-discovery exception may be available to the prosecution where a violation of *Miranda* has occurred, the State has not met its burden of persuasion in this case. Nothing in the record indicates that the argument was ever raised before the presiding justice in Superior Court or that he was asked to make the findings of fact necessary to determine whether the police lawfully acquired knowledge of the location of the mattresses from an independent source (i. e., whether the search of Wallace's cabin was a legitimate plain-view search), and, if so, whether possession of the mattresses would have been thereafter inevitably obtained by the police.

The trial justice correctly ruled that the mattresses should be excluded from evidence.

The entry is:

Appeal denied.

Remanded for further proceedings consistent with the opinion herein.

POMEROY, J., sat at oral argument and conference but retired prior to the preparation of the opinion.

ARCHIBALD, J., did not sit.

---

**6.** *But see United States v. Falley*, 489 F.2d 33 (2d Cir. 1973) (inevitable-discovery exception applied to certain testimonial and documentary evidence, Oakes, J., dissenting in part on the ground that *Paroutian* was being overruled *sub silentio*.)

**7.** In jurisdictions that recognize the inevitable-discovery exception, the rule is not settled as to the quantum of evidence the State must produce to carry its burden of persuasion. *See* R. LaCount & A. Girese, *supra* at 491.